We are now going to move to appeal 23-1460, excuse me, the United States v. Mendez. We'll begin with argument from the appellant, Mr. Durek. Thank you. Good afternoon, your honors. I'm Mark Durek on behalf of Mr. Mendez, the appellant. Your honors, we respectfully request that the court reverse the district court's order upholding the warrantless search of Mr. Mendez's cell phone because a citizen does not lose a of privacy in their cell phone simply by crossing the border, and the good faith exception to the exclusionary rule cannot apply in the absence of binding precedent specifically controlling this issue. This is an issue which affects millions of Americans every year. It is a critical Fourth Amendment issue, and it's an issue which has come before this court twice before, and it is one that the court should now address directly, not that it Would we have to overrule Skaggs and Wanchukwu to find for you? Well, not necessarily. Because those seem very similar. Why wouldn't we have to overrule those? Well, I think the facts are materially different. Regardless of our legal arguments, the fact is that the reasonable suspicion factors in this case are far different than they were in the previous two. In the previous two, you had associations with children that were established prior to the search. You had information about what the defendant was doing in the foreign country. There was lying about what the defendant was doing in the Philippines, or excuse me, in Thailand, in Wanchukwu. He lied about what he was doing there. He claimed to be in a hotel. He said he was traveling around the country. They found receipts from a hotel. There was extensive evidence prior to the search in both of those cases. Here, all you have is a criminal record and travel. That's it. Now the agent says that Would we have to overrule those two if we find no good faith? If we find that the good faith exception doesn't apply? Yes, I think we are asking the court to recognize that Wanchukwu and Skaggs are outliers in the consistently applied the good faith exception only where there's binding precedent specifically authorizing the police practice. The binding precedent here comes from border searches, right? Has the Supreme Court ever found a border search unconstitutional? I can't answer that question, Your Honor. I'm not aware of an opinion that did. I'm not either, or that we have ever found a border search unconstitutional. That's true, but it's also true that the Supreme Court has never addressed a search like this one. Well, the question is, in essence, who's trying to extend the existing precedent? I don't see anything in Riley or Carpenter, for example, that suggests that they apply to border searches. Certainly in Riley, the court says that we're only addressing the search incident to arrest exception. So I don't see how a law enforcement officer or the CPB wouldn't have good faith reliance on 200 years of border search jurisprudence. Well, those 200 years address nothing like a cell phone. We're talking about gas tanks. We're talking about drug smugglers. We're not talking about anything that could be remotely compared to the search of a home, and this is even more intrusive than a search of a home. Okay. One of the things that struck me about your briefs, and you began your argument with it today, you referred to citizenship. Does citizenship matter here? I think so. So somebody who's a lawful permanent resident would not be protected? No. I mean, to the extent— So who's protected? Somebody returning? Only a U.S. person returning? Not a tourist or a visitor? You know, I think to the extent that there's information that somebody's an enemy combatant, you know, somebody's a foreign spy— Is that what it would take? I don't know, Your Honor, but I think it is important to note that Mr. Mendez is a citizen and he's born with certain— Has the Supreme Court indicated that its border search precedents depend upon citizenship? I'm not aware that it has. Has any circuit ever found that distinction? I'm not aware of that. Is there any aspect of the fact that this is a virtual border 20 miles from where we now sit versus being on an actual border of the country? You're asking, is this a virtual border? I mean— Well, is there any aspect of that? We're sitting in Middle America, right? And this is a virtual border, meaning he's come in, he's going through customs, this is where this happens. Is there any actual geographic territorial border of the country? We don't dispute that this is the border, so no, I don't think that it does. The point is that the border search doctrine is a doctrine of physical place that was developed over 100 years ago. And what we're dealing with is a reasonable expectation of privacy in a modern digital device. And the two are not easily mappable on one another. The search of a cell people passing through a physical space, the information on a cell phone exists in the ether, it can be stored on remote servers. There's no guarantee that the information the agent is looking at is actually at the border. So to use the border search doctrine to justify this type of search is a very poor analog. What we should be doing is considering reasonable expectations of privacy under caps and not under border search cases from 100 years ago. So are you saying the border search doctrine shouldn't apply at all anymore, that it should be replaced? I'm saying the border search, it's the government's burden to prove an exception to the warrant requirement. A warrant is the default. And they have not met that burden here because the reasons underlying the border search exception do not apply so easily to a cell phone. The other point is that the border search exception exists to stop the flow of contraband. And certainly a cell phone may contain digital contraband, but the searches of cell phones at the border do very little to prevent the flow of that contraband. So the government's interest here is actually less than the typical border search, while at the same time the privacy interest is just about as high as it could possibly be. Would you like to reserve the remainder of your time? Yes, Your Honor. Thank you, Mr. Durek. We'll now move to argument on behalf of the government, Ms. Chong. Good afternoon, and may it please the court. Ashley Chong on behalf of the United States. This court should affirm the district court's denial of the defendant's motion to suppress. Here, as this court held in Skaggs, even assuming that some level of individual suspicion is required to search someone's cell phone at the border, suppression is simply not warranted under the good faith doctrine. As this panel has already flagged, here we are, we have hundreds of years of binding precedent holding that no suspicion is required for border searches of property, and drawing a distinction only when it comes to searches of a person that are particularly intrusive, that is searches of the elementary canal, strip searches, et cetera. And even there, the Supreme Court has only held that reasonable suspicion is required. Respectfully, I believe my colleague is misreading the precedent here with respect to border searches of electronic devices. Counsel, what would have happened if the defendant had refused to provide his passcode for the phone? I think if a defendant had refused to provide his passcode, one, I think that would be a contributing factor in terms of reasonable suspicion, which we can discuss later on. But also, if that passcode had not been provided, I think then there would be possibly a different analysis that would have occurred at the border. I certainly, in Wanjiku, for example, where Wanjiku initially refused to provide his password, there the CBP official informed Wanjiku that we could still hook up your device to an external device that could potentially run passcode decryption, et cetera. We could still gain access to your advice. And at that point, Wanjiku did provide it. I think ultimately it's tough to say how the facts would necessarily shake out in that I think there may very well be. Can we talk about reasonable suspicion? Because I'm troubled by the idea that with this, with the information that you had here, that the agents had here, they could stop somebody on the streets of Chicago and detain that person for questioning. Certainly, Your Honor. But I think here, first of all, it's reasonable suspicion at the border. And it's one that also here needs to be considered in the border context, which in the border context, as this court is aware, it's a situation where the government's interest in the search is paramount and where an individual's expectation of privacy is at its lowest possible point. So you're arguing we have probable cause, reasonable suspicion internally, and a different level, a lower level for reasonable suspicion at the border? No, Your Honor. I think it's still a reasonable suspicion standard. Okay. However, I think here, so actually, just taking the factors here that existed, I think the government understands that there are other factors that contributed to reasonable suspicion in, for example, Wanjiku and Skaggs, as well as the different circuit cases that are cited. Nonetheless, here, I think the facts were sufficient and the district court correctly did find there were specific articulable facts that supported reasonable suspicion here. Which were? So that included, first of all, the CBP lookout from an intelligence group relating to child pornography. That is circular, because that lookout was based on everything else that you're about to tell me, right? I think that information about what specifically the lookout was based on is actually not in the record. What's in the record is- Was it based on anything else? Not that I'm aware, and I don't know what that lookout was based on, but first, we do still have that CBP lookout. And even if circular, then, in assuming that Your Honor is correct about what it was based on, that lookout was most likely based on the fact that, first, that the defendant had a 2010 arrest specifically relating to indecent solicitation of a child and child pornography. So those are charges that involve minor victims. That arrest then resulted in- He's got a relevant criminal record. That's clear. Yes. Suppose he's walking down Deerborn Street in front of this building. Is that enough to stop him and check his cell phone? No, Your Honor. Just a criminal record would not be sufficient. However, here, we also have the fact that the defendant had prior solo travel to a variety of countries with a frequency or variety that wasn't explained and which the CBP officer found odd. We also have the fact that there was a different secondary inspection report from the border where the defendant had claimed that all of his devices had been taken, that he had been kidnapped, and that he'd been told to leave the country, Mexico, previously, which is another specific factor. Why is that suspicious? I think it's suspicious just that the fact that those claims, I think, are somewhat- I think they could- and I apologize. This is now becoming circular, but I think they peaked the CBP officer's suspicion. Okay. Peaking suspicion is different from- and somebody being worth talking to is different from having grounds to do a Terry stop on somebody, right? Yes, Your Honor. And we're talking here about involuntary seizure of individuals not only at the border, but you're telling us this would be perfectly appropriate in the Chicago loop. Well, what I'm saying, Your Honor, or trying to say is that all of these factors taken apart in a divide-and-conquer approach obviously would not on their own be enough. But here, in addition to everything we've already discussed, we also have the fact that the defendant was traveling at that point from Ecuador, which the CBP officer identified as a source country for child trafficking. Are there any countries that don't qualify as sources for child trafficking? Not that I'm personally aware of. I'm concerned about somebody's traveling, for example, on a known drug transportation route, which is essentially every interstate highway in the United States. And I'm just wondering if there are countries that are excluded from that list. I don't know, Your Honor, and I don't think the record speaks to whether a country is excluded, although I do think Officer Callison was cross-examined about this at the suppression hearing. However, in addition to all of these factors we've already discussed, here we also have the fact that upon interacting with the defendant at the border, Officer Callison specifically flagged that the defendant was condescending and evasive in his demeanor, as if he was trying to deflect attention away from inspection. So that, again, is a factor above and beyond his prior criminal charges and conviction, his prior travel, his prior inspection report, and the other facts of his travel at this point coming from Ecuador. He testified about that, correct, at the suppression hearing? Yes, Your Honor. And the court found him credible? Yes, the court found him particularly credible, I believe. And finally, although this was not a factor that the district court relied on in making its decision down below, there was also here the specific interest that Mr. Mendez showed as to whether the customs officials were going to search his personal phone. So upon being asked about his belongings and devices, Mr. Mendez specifically asked only about whether the officer was going to search his personal phone. And again, it's a relatively small factor, but taken together with everything else, the government submits that here there were specific articulable facts supporting reasonable suspicion. And finally, I think this obviously comes after the CBP officer starts scrolling through Mr. Mendez's phone manually. But at that point, within 30 minutes, he sees child pornography images involving toddlers on Mr. Mendez's phone. Ms. Chung, in your brief, you suggested we should consider distinguishing between this kind of search, that is the first 30 minutes, and a so-called forensic search. What do you understand the difference to be? Your Honor, I think those are distinctions that have been drawn by various cases around, pardon me, courts around the country at this point, where they've used different nomenclature, but they refer to searches as basic, manual, or routine searches of devices. I've read those cases too. You've talked to agents. Can you give us some more specific content to that difference? Certainly. I think, in general, the difference has been that whereas manual searches involve scrolling through the phone with one's hands, et cetera, that forensic devices involve connecting the phone or device to some sort of external technology, whether it's software or hardware, and then allowing it to run a more in-depth examination. The scope of that examination can differ. For example, here, what we've referred to as a forensic preview, and which was also referred to as a forensic preview in Wanjiku, was a preview that did not involve, for example, decrypting encrypted files. It didn't involve altering the contents of the phone, and it didn't involve the entirety of the phone's contents. In fact, here, the forensic preview that occurred on Mr. Mendez's device was specifically limited to just his camera roll. Is it the more intrusive nature of the forensic search that the distinction is based upon, or is it the use of additional technology to get to the contents of it? I think it's the former, Your Honor, in looking at the case law, that it is the intrusive nature and the potentially comprehensive nature of the search of the phone. That said, and I would like to clarify, I don't think the government is necessarily advocating for drawing such a distinction. The government's position here is that by virtue of this search happening at the border, that no level of individualized suspicion is required, whether for a manual or for a forensic search. So if I'm returning from a trip abroad, the agents can plug a device into my laptop or iPad and cell phone and make a copy of everything, if they wish to? Yes, I think that is what's supported under the precedent with respect to border search authority, Your Honor. That said, and as a practical matter, I mean, there obviously are limits to how many of these types of searches that CBB can do. And I believe the Customs and Border Agency, in fact, publishes statistics regarding how many border searches of electronic devices it carries out. That's published information that shows that it's, at least in fiscal year 2020, approximately less than 0.14% of arriving international travelers. And we certainly don't have to reach that decision to resolve this appeal. Certainly. Exactly, Your Honor. I think here, this appeal, the outcome of this appeal is, I think, determined by this court's decisions in Wanchiku and Skaggs. I think that those decisions rightly observed that as of the time of the searches in Wanchiku and Skaggs, which came both slightly before and slightly after the search involved in this appeal, that at that time, there was binding precedent establishing that no level of individualized suspicion was required for any search of property at the border. And here, where the defendant is trying to then, I think, extend Riley and Carpenter beyond the scopes of those decisions, and also ignoring the fact that there already is a distinction that has been drawn, and that distinction is one not between cell phones versus other containers or things that may carry information, but rather a distinction that's been drawn between property versus someone's personal dignity and privacy. Thank you, Ms. Chong. Thank you. Thank you. Mr. Dirk, we'll now go to you for rebuttal. Thank you, Your Honors. On the issue of reasonable suspicion, there was mention of testimony about Mr. Mendez being evasive, being condescending. The record, the testimony in the record is that when the agent began the process of asking to search for Mr. Mendez's, search for Mr. Mendez's phone, Mr. Mendez is objected. He said something to the effect of, you know, I'm above being searched. I'm a United States citizen. That was what the testimony was. There was testimony about later, after the search began, that Mr. Mendez mentioned how he knew some other agents at O'Hare he had interacted with previously. That's all the record shows. It doesn't show any evasive behavior like you had in Skaggs, where the defendant went out of the line and tried to hide in the bathroom. Doesn't have evasive behavior that was present, there's no evasive behavior like in Logic Q, where the defendant lied about what he was doing in the foreign country. Reasonable suspicion requires articulable facts. It's not a matter of opinion. An agent can always say somebody seems evasive. Somebody coming home at midnight on a 7 or 8 hour trip from Ecuador and then is subject to a, I'm sorry, through Panama, yes, and is being subjected to a several hour search. Someone like that is obviously going to be tired, frustrated, that's almost no consequence. Of course it's totality of the circumstances, but an agent can almost always say that somebody is evasive, condescending. That's not enough. You need facts. And here there are no facts showing reasonable suspicion. What you have is travel and a criminal record. There's no information, as the agent himself admitted, no information that at the time of the search that Mr. Mendez was actively involved in a crime, in smuggling contraband, in doing anything. This was all speculation. And for that reason, there's no reasonable suspicion, which at the very least should be required here. And on the point of manual versus forensic searches, the so-called forensic search here, the Domex equipment, which extracted all of the files out of the phone, when I asked the agent about that, he admitted the purpose of that was criminal prosecution, to preserve evidence for criminal prosecution. You cannot defend that search on the basis of the border exception when the point is to establish evidence for a criminal prosecution. That absolutely requires a warrant. When was the phone wiped? Subsequent to Mr. Mendez's departure from the airport. But before, but after the copying? After the copy had been made, correct. Correct. So at the very least, Your Honors, the forensic search here for the purpose of criminal prosecution required a warrant. And we would submit that the original search required a warrant, because a search of a phone, Riley says this much, a search of a phone is as intrusive as a search of a home, if not even more so. And that just doesn't fall away at the border. You know, it was Justice Brandeis who said, maybe 90 years ago, that the most insidious dangers to liberty happen when well-meaning government agents try to push the envelope. They may be well-meaning, but that's when you have to be on the most guard against government incursions, because those are the areas in which the dangers to our Constitution are the greatest. And for those reasons, we ask the Court to reverse. Thank you, Mr. Durek. Thank you, Ms. Chung. The case will be taken under revisement.